## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GARY L. MASSETTI, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:18-cv-1001-RJC |
| v. | ) | |
| | ) | |
| CREE, INC., | ) | |
| | ) | |
| Defendant. | | |

## OPINION

**Robert J. Colville, United States District Judge.**

Pending before the Court is Defendant Cree, Inc.'s Motion for Summary Judgment.

(ECF No. 36).  For the reasons stated herein, the motion will be granted.

## I.     Introduction and Factual Background

### A.  Procedural History

This age discrimination action was initiated by Plaintiff Gary L. Massetti ("Plaintiff" or

"Massetti") with the filing of a complaint on July 27, 2018. (ECF No. 1).  Count I of the

Complaint alleges violations of the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621 *et seq.,* and Count II alleges violations of the Pennsylvania Human Relations Act

("PHRA"), 43 P.S. § 951 *et seq.*

This Court has subject-matter jurisdiction because Plaintiff's claims arise under federal

law. 28 U.S.C. § 1331. Venue is proper because a substantial part of the events giving rise to

Plaintiff's claims occurred in the Western District of Pennsylvania. 28 U.S.C. § 1391(b)(2).

On October 5, 2018, Defendant Cree, Inc. ("Defendant" or "Cree") filed an answer.

(ECF No. 5). Discovery ended on October 30, 2019.  On December 30, 2019, Cree filed the

now-pending Motion for Summary Judgment (ECF No. 36) with Brief in Support (ECF No. 37),

as well as a Concise Statement of Material Facts ("SOF") (ECF No. 38) and Appendix.  (ECF No. 39).  Plaintiff has filed a Brief in Opposition (ECF No. 47), a Counter Statement of Material Facts (ECF No. 45) ("Pl.'s Counterstatement of Facts"), and an Appendix thereto. (ECF No. 46). Cree has filed a Reply Brief (ECF No. 52), a reply and response to the Counter Statement of Material Facts (ECF No. 50) and supplemental Appendix (ECF No. 53).

On February 4, 2020, this case was reassigned to this member of the Court for all further proceedings.  (ECF No. 42).

The matter is now ripe for consideration.

### B.  Factual Background

Unless otherwise noted, the following facts are not in dispute.  Headquartered in Durham, North Carolina, Cree designs and manufactures lighting-class LEDs, lighting products, and products for power and radio frequency applications. Massetti, a resident of Allegheny County, Pennsylvania, was 48 when on June 18, 2012 when he began working for Cree as a Strategic Account Manager in its lighting sales department. As Cree's corporate liaison to WESCO—a major distributor of Cree's lighting products—Massetti was responsible for developing relationships with and growing Cree's lighting sales to WESCO. Cree expected Massetti to educate WESCO regarding Cree's lighting products, ensure collaboration between the Cree and WESCO salesforce, and persuade WESCO to purchase and stock Cree products. (SOF ¶¶1, 2-5).

#### Fiscal Year 2013

At the beginning of his employment, Massetti reported to Director of Sales-Distribution John Spencer ("Spencer"), As early as 2013, Spencer began questioning Massetti about his failure to meet established objectives, aggressively pursue sales goals, and demonstrate growth in WESCO's sales. In Massetti's fiscal year 2013 performance appraisal, Spencer noted that Massetti failed to fully achieve three of his four identified goals: (1) achieve quarterly sales

targets; (2) develop a strategy and tactics for assigned accounts with metrics which drive global and corporate account growth; and (3) create a quarterly marketing and training plan to drive increased mindshare within assigned accounts. Plaintiff's shortfall in the identified areas was 10 percent, 2 percent and 5 percent, leaving the Plaintiff with an overall score of 83 percent out of 100 percent.  (Pl.'s Counterstatement of Facts at ¶ 9).  Spencer further cautioned Massetti that:

> Cree is a company that requires extraordinary growth, well in excess of industry norms. Gary needs to find methods to increase the speed of growth within his accounts…Gary must determine the levers to push WESCO beyond the comfortable pace they typically employ.

Given that WESCO was "resistant to change or unable to change as fast as Cree require[d]," Spencer instructed Massetti to implement "approaches that will be uncomfortable for some relative to timelines and resources." Massetti therefore understood that he was getting pressure to improve and grow Cree's sales with WESCO. (SOF ¶¶ 6-9. 11, 15-16). Spencer also indicated that Plaintiff "met expectations" in fiscal year 2013 and identified the following as categories in which Plaintiff excelled in his performance: "informal direct communication and relationships;" "all decisions should be based on what is best for the company and shareholders;" and "trust and integrity are cornerstones to our success." (Pl.'s Counterstatement of Facts at ¶¶ 9, 10).

Plaintiff received an overall performance rating of 3 out of 5 in fiscal year 2013 and an overall performance rating of 3.2 out of 5 in fiscal year 2014. (*Id.*at ¶ 8).

## **Fiscal Year 2014**

In Massetti's fiscal year 2014 performance appraisal, issued in September of 2014, Spencer again noted that Massetti failed to fully achieve three of his four established goals, including to: (1) achieve quarterly sales targets and develop a strategy and tactics for WESCO to drive the Focus markets, (2) create demand, and (3) achieve double digit quarterly growth. (SOF

¶ 18).  Plaintiff's shortfall in the identified categories was 15 percent, 5 percent and 1 percent, leaving the Plaintiff with an overall score of 79 percent out of 100 percent. An overall score of 70 percent or higher is necessary to "mee[t] expectations."  (Pl.'s Counterstatement of Facts at ¶ 18).  And while the performance appraisal template required Spencer to "pick only 3," Spencer selected four Cree values on which Massetti's performance needed improvement: (1) Cree is we (further defined by the example, "If your conversation includes 'they' and 'I,' you don't get it."); (2) Demand accountability, responsibility, and ownership to exceed the goal; (3) If you see something stupid, fix it; and (4) Respect and authority are earned, not legislated. Spencer's comments on Massetti's overall performance also warned him to "Leave no doubt about the expectations" and mandated that he "must exhibit a willingness to aggressively pursue his commitments to Cree (doubling sales in FY15)." (SOF ¶¶ 19, 21-22).

In addition, Spencer identified the following as areas in which Plaintiff excelled in his performance: "informal direct communication and relationships;" and "trust and integrity are cornerstones to our success."  (Pl.'s Counterstatement of Facts ¶ 19).  Spencer identified the following personal skills as those in which the Plaintiff excelled: "communication;" and "initiating action." (Pl.'s Counterstatement of Facts ¶ 20).  Spencer also commented that "[Plaintiff's] relationships within the industry have been valuable in elevating Cree within the organizations he is responsible for." (*Id*.) Mr. Spencer further noted that, "[l]eadership changes within WESCO specifically have created new processes that have challenged our typical speed to market. (Pl.'s Counterstatement of Facts at ¶ 21).

While Massetti did not achieve all of his identified fiscal year 2014 goals, the WESCO global account did have a 56% year-over-year growth rate that year. Because of its potential, in September of 2014 Cree designated WESCO as one of three Cree Strategic Partners (referred to

as "CSPs") for the Company. (SOF ¶¶ 23-24). Spencer indicated in Plaintiff's 2014 performance appraisal that "[Plaintiff's] established presence with his assigned account created the conditions necessary to select WESCO as one of three CSP Distributors." (Pl.'s Counterstatement of Facts ¶ 24).

In January of 2015 sales to WESCO were significantly behind Cree's annual and quarterly targets. The prior quarter Cree had shipped just $4,666,775 in lighting products against a plan of $7,034,983 and therefore had to increase its goal for the next quarter by $2.4 million in sales. To that end, on January 15, WESCO's Vice President of Supplier Relations Sean Nacey ("Nacey") noted that Cree and WESCO did not "have a good drumbeat" or the "desired level of mutual accountability." (SOF ¶¶25-27; Pl.'s Counterstatement of Facts at ¶ 26).

### Fiscal Year 2015

In the first year in which Cree designated WESCO a CSP Cree expected Massetti to achieve $41 million in total sales to WESCO. Instead, during that time (October 2014 through September 2015), Cree's total sales to WESCO were $21 million—half of the total sales target. (SOF ¶¶ 28-29). Spencer provided Massetti with his 2015 performance appraisal on September 10, 2015. When commenting on Massetti's overall performance, Spencer confirmed: "The numbers in FY15 were not there. By any metric the account performed well below expectations." Indeed, Massetti fell short of his sales requirements in each quarter, achieving only 84% of this requirement in quarter one, 66% in quarter two, 71% in quarter three, and 85% in quarter four. Noting that, "[i]t is clear that the plan and execution in place does not work," Spencer cautioned Massetti that Cree "ha[d] to see the expected growth early this [fiscal year]" and that "[n]ot growing in [fiscal year] 2016 is not an option." (SOF ¶¶ 30, 32-33, 37).

During the 2015 fiscal year, Massetti failed to fully achieve four of his five articulated goals, which included: (1) achieving quarterly sales targets as determined by the VP of Sales; (2) developing a CSP strategy and tactics for WESCO with metrics which drive the Focus markets, create demand, and achieve double digit quarterly growth; (3) Secure the Cree product line as a preferred produce of choice within . . .WESCO to grow Global Account and Renovation sales – achieve 50% plus growth; and (4) on-board new business developers. (SOF ¶ 31). Plaintiff's shortfall in the identified categories was 10 percent, 5 percent, 6 percent and 7 percent, leaving the Plaintiff with an overall score of 72 percent out of 100 percent. Again, an overall score of 70 percent or higher is necessary to "mee[t] expectations."  (Pl.'s Counterstatement of Facts  ¶ 31). However, Plaintiff was also able to achieve "double digit growth" in fiscal year 2015 in the form of a 31 percent year over year ("YOY") increase in sales. (Pl.'s Counterstatement of Facts ¶ 32). Spencer, in commenting on Massetti's overall performance, noted the account performed well below expectations. Spencer further noted, however,  that "[Plaintiff] is a Cree champion." Mr. Spencer also acknowledged that "WESCO did grow 31% YOY, below Cree aggregate growth, below CSP expectations, however well above WESCO growth for similar products."(SOF ¶ 33; Pl.'s Counterstatement of Facts  ¶ 33). Spencer identified the following as areas in which Plaintiff excelled in his performance: "informal direct communication and relationships;" "trust and integrity are cornerstones to our success;" and "the company's goals are more important than individual goals." (Pl.'s Counterstatement of Facts ¶ 35).

## Fiscal Year 2016

Vice President of Lighting Sales Jim Miller ("Miller) became Massetti's supervisor in December 2015. Massetti believed Miller "wasn't bad" as a manager and that he (Miller) treated Massetti fairly. (SOF ¶¶ 40-41).

Cree's concerns about its relationship with WESCO were so serious that in December 2015 Miller's boss, Cree's Senior Vice President of Global Sales and Business, Steve Barlow ("Barlow"), sent an email to Miller and Vice President of U.S. Sales Craig Lofton ("Lofton") voicing criticism of Massetti.  Barlow described a recent WESCO purchase order that Massetti brought in as "nonsense" and indicated that WESCO's order was "a joke relative to the [point of sale] run rate." Miller was so concerned about WESCO's deteriorating sales that in March 2016, he wrote directly to WESCO's then Lighting Director, Jeff Pecoroni ("Pecoroni"), about Cree's "share slip and softness at WESCO" and the "key contributors to [Cree's] poor performance." In response, Pecoroni informed Miller that of WESCO's five main lighting product vendors, Cree had slipped from a 13% market share in 2015 to an 8% market share in the first fiscal quarter of 2016, and had fallen to the lowest ranked of WESCO's suppliers. Miller immediately sent Pecoroni's report to Massetti and noted: "This is pretty concerning." (SOF ¶ 42-46).

According to Plaintiff, losses in WESCO revenue were the direct result of organizational changes at WESCO, manufacturing problems, management turnover, pricing issues and/or delivery challenges, all of which were beyond the Plaintiff's control.  (Pl.'s Counterstatement of Facts ¶ 45).

In April 2016, Miller sent Massetti a Lighting Sales Incentive Participant Form, establishing WESCO's 2016 quarter four sales goal at $8.19 million (based on shipments/revenue). Miller also noted: "If we are going to meet the projected outlook from WESCO of >$40M in sales…it is critical that we continue to put the programs in place that will support their growth." (SOF ¶¶ 47-48).

In June 2016, Miller emailed Cree lighting sales employees—including Massetti— regarding organizational changes within the department. He noted that Cree's CSP partners—

WESCO, Rexel, and Crescent—remained its "most important and focused distributors" and that they would continue to be managed by senior sales managers—Massetti, Brian Kelly ("Kelly") and Paul Alger ("Alger")—who were "responsible for [the] success of the total relationship for each of their assigned distributors." (SOF ¶¶50-51).

It is undisputed that Plaintiff did not achieve required sales and performance goals in 2016. Although he was expected to "achieve double digit quarterly growth" and "grow WESCO target accounts by 20%", the total shipped revenue from Cree to WESCO for fiscal year 2016 was lower than that in fiscal year 2015. Similarly, Massetti achieved only $5.16 million of the $8.16 million requirement for shipped products to WESCO in the fourth quarter. (SOF ¶¶ 55, 56).

In August 2016 Miller provided Massetti with his 2016 performance appraisal. As stated in prior appraisals, he noted that Massetti failed to fully achieve three of four identified goals, including: (1) achievement of quarterly sales requirement as determined by the Vice President of Sales: (2) develop a sound strategy and tactics for WESCO with metrics which drive the Focus markets, create demand, and achieve double digit quarterly grown; and (3) redirect WESCO Global accounts back to a grown mode and stronger relationship within Cree and WESCO – grow WESCO target accounts by 20%. (SOF ¶¶ 53). Plaintiff's shortfall in the identified categories was 8 percent, 15 percent and 5 percent, leaving the Plaintiff with an overall score of 72 percent out of 100 percent. (Pl.'s Counterstatement of Facts at ¶ 53).

Miller also confirmed that "WESCO did not reach their sales objectives in 2016" and that "within WESCO Cree also lost share." Miller also noted that, "[m]any of the contributing factors to this were outside of the sales team control, delays, operations issues, etc." Miller also indicated that "[Plaintiff] has a very good corporate Wesco relationship that has helped Cree

weather the storm and has highlighted issues to be resolved within Cree to improve the

situation." (Pl.'s Counterstatement of Facts at ¶ 54). Miller therefore told Massetti what he

needed to change, including:

- "We failed to achieve the growth we targeted. There have been times where I felt that Gary needs to be pushed to move himself and WESCO out of their respective comfort zones…and get more aggressive with programs and promotions that will fundamentally change the vector which we are currently on. Doing things the way we have always done them will not alter our current results. We must be more creative and aggressive."

- "Gary can be much more effective by holding his key distributor partners at WESCO accountable for meeting their commitments which will allow him to meet his."

- Cree was not perceived as a "serious enough partner" of WESCO's and was "still fundamentally in the same place [they] were with WESCO last year and need[ed] to do better."

- Gary must improve his relationships with the sales leaders at WESCO and hold them accountable for meeting their sales objectives."

(SOF ¶¶ 52-56, 58, 60, 62-65). Miller also indicated that "[o]ur executive relationships at

WESCO remain strong and [Plaintiff] has done a good job keeping those doors open despite

numerous delivery and operations challenges last year."  (Pl.'s Counterstatement of Facts ¶ 63).

### Fiscal Year 2017

During the first quarter of fiscal year 2017 (i.e., July through September 2016), Cree's

shipped quarterly revenue from WESCO totaled $3,592,153, constituting a revenue decline of

more than $1,000,000 when compared to the first quarter of fiscal year 2016. During the second

quarter of fiscal year 2017 (i.e., October through December 2016), Cree's shipped quarterly

revenue from WESCO totaled $5,094,602, which also constituted a revenue decline of more than

$1 million when compared against the same period in the previous fiscal year. (SOF ¶¶ 66-67).

**<u>Shane Bickley's Supervision Begins</u>**

In May 2017, Shane Bickley ("Bickley")—who was born in 1974—became Cree's Vice President of Channel Management responsible for overseeing Cree's national distributor account executives, including Alger, Brian Hollin ("Hollin") (who assumed responsibility over CSP Rexel and who was born in 1973), and Massetti, as well as a team of employees that managed those distributors for Cree. Bickley, in turn, reported to Senior Vice President of Commercial Lighting Sales, Keith Eagle ("Eagle"), who was born in 1968. (SOF ¶¶ 68-69).

Bickley received access to and reviewed previous performance reviews for all of his newly assigned direct reports. After reviewing Massetti's evaluations, the progressive decline in WESCO sales over the preceding years, and Massetti's failure to meet his sales requirements for a number of years, Bickley concluded that Cree's relationship with WESCO was declining. Bickley also knew that Massetti's sales to WESCO for fiscal year 2017 totaled less than $17.5 million, which was a 16.8% decrease from sales for the previous fiscal year. (SOF ¶¶ 70-73). Bickley testified that that Plaintiff "may have met [his sales goals] in the first and/or second year on the job, and from there on, he did not. (Pl.'s Counterstatement of Facts at ¶ 72.  In addition, Bickley spoke with WESCO executives—including Nacey, Director of Lighting Skip Pasternak ("Pasternak"), and Supplier Relations Manager Dipesh Pandya ("Pandya")—and concluded that WESCO was not receiving regular updates regarding new products and promotions from Massetti and therefore did not have a sense of what was going on at Cree. (SOF ¶¶ 74-75).

Bickley also had concerns regarding Massetti's tenacity, willingness to rock the boat, and propensity to provide excuses when he felt an assigned task could not be accomplished. By way of example, in the summer of 2017, Bickley and Eagle requested that Massetti secure an

average-sized end-of-quarter stock order from WESCO in the amount of $500,000.[1] In response,
Massetti informed Bickley that he was "having a very difficult time building an order to the size
requested" and stated that "the best [he] could come up with [was] around 250K," which he
(Massetti) characterized as "a stretch." Bickley believed that a $250,000 stock order was an
amount that WESCO would have bought anyway and therefore represented "the path of least
resistance" which was inconsistent with the end-of-quarter push Cree expected. After reviewing
Massetti's proposed stock order as well as WESCO's average end-of-quarter orders and
inventory, Bickley revised the stock order to include new products and increased quantities and
sent it to Massetti for follow-up. Around a month later, Massetti reported to Bickley that he was
getting stonewalled by WESCO on the stock order, noting that Pasternak (WESCO's Director of
Lighting) was apprehensive about moving forward with the purchase. When Bickley then told
Massetti to pursue the sale with Nacey, he (Bickley) sensed that Massetti was hesitant to do so.
Given that time was of the essence, Bickley apprised Eagle that if Massetti did not receive a
commitment on the stock order by the early afternoon of July 12, 2017, he (Bickley) would
contact Nacey directly. When Massetti failed to secure the order, Bickley contacted Nacey and
closed the $500,000 stock order, before Massetti could do so. (SOF ¶¶ 76-84).

During the time he was in the Vice President role, Bickley both personally observed and
learned from Massetti's coworkers—including Rick Simon ("Simon"), Hollin, and Lofton—that
Massetti openly criticized Cree. Bickley saw that Massetti rarely associated himself as being part
of the Cree team, and instead would speak of Cree in the third person, blaming shortcomings on
Cree pricing or product failures. For instance, Bickley heard Massetti make negative comments
about Cree in front of Pandya, a key WESCO representative. During a July 2017 team meeting at

---

[1] Bickley acknowledged that the Plaintiff was getting "stonewalled" on this particular order. (Pl.'s Counterstatement
of Facts  ¶ 77).

which Eagle was present, Bickley also heard Massetti negatively comment about Cree's inventory positions, pricing, and product challenges. (SOF ¶¶ 85-88).

Bickley's numerous concerns about Massetti's performance persisted, including that he had not:

- developed adequate relationships across all functional aspects of the WESCO account;
- developed a consistent communication cadence around driving revenue attainment;
- been proactive in endeavoring to complete tasks before involving management;
- maintained a strong customer-facing approach to his role; and
- achieved established sales goals over a period of time.

(SOF ¶ 91).

## Performance Improvement Plan Instituted

In August of 2017 Bickley therefore recommended that Massetti be placed on a performance improvement plant ("PIP") in order to get the WESCO account back on track. (SOF ¶91). After receiving approval from Eagle, Human Resources Manager Loren Nowoc ("Nowoc"), and Employee Relations Specialist Charity Inglis ("Inglis"), Bickley prepared a 60-day PIP, which Cree delivered to Massetti on August 24, 2017, and which included three specific conditions that Massetti had to achieve in order to successfully complete the PIP:

(1) Achieve quarterly revenue goal for WESCO of $4.18 million (which needed to be accomplished by the end of the first quarter (i.e., September 22, 2017);
(2) Conduct quarterly in person meetings and monthly "Pulse of the Business" teleconferences with key stakeholders, with the meeting invitees to be mutually agreed upon between Massetti and Bickley; and
(3) Develop specific quarterly and annual plans needed to achieve growth targets in stock, project, and POE categories, with success to be measured based upon the obtainment of these goals in the first quarter/first month of the second quarter.

(SOF ¶¶ 95, 102).

Upon receiving the PIP, Massetti understood that Cree needed to see significant improvement in his performance, and that if Cree did not think he was meeting its objectives during or at the conclusion of the PIP, it could end his employment. On August 24, 2017,

Massetti returned a signed copy of the PIP to Bickley, along with his written comments to it. At no time during his employment, including in his email to Bickley, did Massetti contend that the PIP requirements were unachievable or otherwise unfair. (SOF ¶¶ 103-105).

After issuing Massetti the PIP, according to Defendant, Bickley had "milestone meetings"—check-ins to discuss Massetti's progress and performance under the PIP—with him. The first  meeting occurred on or about September 15, 2017, at which Bickley noted that while Massetti had provided action plans for the week and planned in-person meetings with the WESCO team for September and October, his sales revenue was "tracking down considerably in both the stock and project categories." Bickley therefore told Massetti he needed to identify actions to drive business for the balance of the first and second quarters. (SOF ¶¶ 106-109). The record contains Bickley's notes from this September 15, 2017 meeting.  Plaintiff contends that Bickley did not meet with him during every milestone meeting nor did he provide plaintiff with regular guidance regarding his job performance.  ((Pl.'s Counterstatement of Facts ¶106).

At the second milestone meeting on September 29, 2017, Bickley noted that Massetti was "off significantly" from the Q1 $4.18 million revenue goal. Bickley also told Massetti that while he had progressed on his second and third goals, he still had a significant way to go to establish the needed cadence of monthly leadership conversations and quarterly in-person meetings. (SOF ¶111-114). Bickley indicated in an e-mail to Mr. Eagle that the Plaintiff was "passing" at that time. (Pl.'s Counterstatement of Facts ¶ 111).

Cree invited key executives from WESCO to participate in a top-to-top meeting in Raleigh-Durham, North Carolina, on October 9, 2017 in order to evaluate the Cree/WESCO relationship, discuss sales objectives and plans, and provide an opportunity for new Cree executives (e.g., Lighting President Daniel Castillo ("Castillo") and Eagle) to engage with

WESCO executives. At the meeting, Massetti reviewed WESCO's shipped lighting sales revenue which showed that, since calendar year 2015, revenue had declined, and that revenue for calendar year 2017 was tracking to be $16,187.00—a notable four-year low for the account. (SOF ¶¶ 115-116, 121-122).

Neither Bickley nor Eagle was pleased with how the October 9 meeting went, including because it became apparent that key WESCO executives were not aware of Cree's new C-Lite stock and flow product line, which Cree had introduced to the market in the spring of 2017. Massetti acknowledges that a WESCO executive at the meeting may not have been well informed on the C-Lite product line and that as a result he (Massetti) understood he needed to better educate WESCO about this important new sales initiative of Cree. During the meeting, WESCO representatives also stated that they had around $16 million of backlog—i.e., planned Cree business from WESCO that had not yet turned into purchase orders. Because Bickley believed that Massetti did not know about this significant backlog, he told Massetti to determine how much of it was viable and could be realized in actual sales. After checking further, Massetti reported that the backlog number WESCO identified at the October 9 meeting was not real, and that the true number was "closer to 3 mil." (SOF ¶¶123-129).

The third PIP milestone meeting occurred on or about October 13, at which Bickley informed Massetti that the October 9 meeting with WESCO executives had "several key misses," including:

  • Unawareness of the $16 million product pipeline mentioned to the Cree leadership team by WESCO; and

  • Gordon (WESCO's Director of Inventory) claiming to have no knowledge of C-Lite.

(SOF ¶¶ 131-132).

14

### Massetti is Terminated

As of October 20, 2017—three days before the scheduled PIP end-date—Bickley concluded that Massetti had not and would not successfully complete all of the requirements identified in his PIP and therefore recommended to Inglis that Cree separate Massetti's employment.[2] As to the first PIP goal, which required Massetti to achieve quarterly revenue from WESCO in the amount of $4.18 million by the end of the first quarter of fiscal year 2017, Bickley concluded that because Massetti achieved only $3.5 million of quarterly revenue, he did not successfully meet that requirement. Massetti admits he did not meet this sales mandate. As to the second goal, which required Massetti to hold regular meetings with WESCO executives, Bickley concluded that Massetti did not successfully meet it. This was because while Massetti did conduct some meetings with WESCO stakeholders, he did not develop the cadence necessary to ensure that the metrics sufficiently improved, and because in those meetings Massetti failed to sufficiently educate WESCO regarding topics such as inventory, backlog, and new products (such as C-Lite). As to the last goal, which required Massetti to develop quarterly and annual plans as necessary to achieve sales goals during the PIP, Bickley concluded that Massetti did not successfully meet it, including because he did not develop a plan to dive into WESCO's backlog or otherwise strengthen the partnership between Cree and WESCO. (SOF ¶¶ 135-141).

After Inglis spoke with Bickley about his conclusions and recommendations, she sent an email to Eagle on October 20, 2017 summarizing them. This included Bickley's conclusion that Massetti had failed to achieve the PIP goals and his recommendation that Massetti be separated from his employment. On or about October 25, Eagle communicated his agreement with

---

[2] According to Plaintiff, Defendant's leadership team, including Bickley, had concluded that the Plaintiff "was not the right person for the WESCO role" prior to placing him on the PIP.

Bickley's recommendation. On October 27, 2017, Bickley and Inglis informed Massetti of Cree's decision to end his employment. (SOF ¶¶ 142-144).

There are no facts in the record to show any age-biased comments or statistics.   Plaintiff admits that during his employment he never heard any of his managers make any comments he considered to be evidence of age discrimination, and never reported having experienced any form of age-related comments, bias, or discrimination to anyone at Cree, including to its Human Resources Department. Further, after Massetti's employment ended Cree continued to employ lighting sales staff who were close in age or even older than Massetti, who was 53 at the time his employment ended. Specifically, those who remained as Bickley's direct reports included: John Darcy ("Darcy") (who was born in 1965 and age 52), Hollin (who was born in 1973 and age 44), and Simon (who was born in 1963 and nearly age 54). (SOF ¶¶158, 167-168).

Plaintiff testified that he and Mr. Eagle knew one another from their prior employment in the electrical industry. Plaintiff reintroduced himself to Mr. Eagle approximately one (1) month into Eagle's employment with the Defendant.  During that conversation, Mr. Eagle indicated that he was looking forward to "fresh talent" and/or a "new and fresh approach."  Plaintiff later perceived Eagle's comment to be indicative of age discrimination, to wit, that Defendant "wanted to get rid of the old guys and bring in new, fresh young guys." (Pl.'s Counterstatement of Facts ¶¶ 167, 168).

Around the time of Plaintiff's termination, Eagle scheduled interviews between Katich and various individuals holding leadership positions within Cree.  Katich was previously employed by WESCO; despite the fact that Katich "didn't have a lighting background," Eagle and Bickley offered the younger Katich the newly created position of Regional Channel

Manager[3] in late October or early November of 2017. In this capacity Katich was responsible for managing Cree's relationship with multiple customers without a CSP designation. (SOF at ¶¶ 147, 148). These included Cree's accounts with USESI, Mayer Electric, and State Electric. Katich began his employment with the Defendant on January 2, 2018 and began servicing the WESCO account "sometime in the middle of 2018." (Pl.'s Counterstatement of Facts ¶¶ 228-231, Def.'s Counterstatement of Facts ¶ 231, 232). Bickley solicited Katich's input as to sales goals, which he was unable to meet. (Pl.'s Counterstatement of Facts ¶¶ 233, 234).

## II.    Standard of Review

Summary judgment may be granted where the moving party shows that there is no genuine dispute about any material fact, and that judgment as a matter of law is warranted. Fed. R. Civ. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S.

---

[3] Bickley – not Katich -- assumed responsibility for Cree's relationship with and sales to WESCO as part of his other duties after Plaintiff's employment ended. Bickley accepted employment with another company over a year after Katich was hired whereupon Bickley made the decision to transfer WESCO (which at that point was no longer a CSP) lighting sales responsibilities to Katich. (SOF ¶¶ 147, 150-151).

133, 150–51 (2000) (citing decisions); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–19 (1986);

*Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248.

## III.   Discussion

Cree moves for summary judgment as to both the ADEA and PHRA claims.[4]  In an ADEA lawsuit lacking direct evidence of discrimination, as here, the order of proof mirrors that of a Title VII discrimination action, as described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009). Plaintiff must first establish a *prima facie* case of age discrimination by proving the following (1) he is forty years or older; (2) he was the subject of an adverse employment action; (3) he was qualified for the position in question; and (4) he was ultimately replaced by another employee sufficiently younger to support an inference of discriminatory animus. *Id.* at 689. Proof of these facts raises an inference of discrimination, which is given the force and effect of a rebuttable presumption. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Once a *prima facie* case is established, the burden shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 254; *Santiago v. Brooks Range Contract Servs.*, 618 F. App'x 52, 54-55 (3d Cir. 2015). "This burden is 'relatively light' and is satisfied if the employer provides evidence,

---

[4] The United States Court of Appeals for the Third Circuit has held that "[t]he same analysis used for ADEA is also applied to PHRA claims." *Prewitt v. Walgreens Co.*, 92 F. Supp. 3d 292, 305 n. 4 (E.D. Pa. 2015) (citing *Fasgold v. Justice*, 409 F.3d 178, 183-84) (3d Cir. 2005)). Thus, the portion of Massetti's PHRA claim pertaining to age discrimination is subsumed in the Court's discussion of his ADEA claim.

which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.,* 707 F.3d 417, 426 (3d Cir. 2013) (citing *Tomasso v. Boeing Co.,* 445 F.3d 702, 706 (3d Cir. 2006)). At this stage, the employer is not required to prove this reason actually motivated its conduct. *Id.*

After the employer has met its relatively light burden of articulating a legitimate non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's proffered explanation is pretextual. *Id.* The plaintiff may meet this burden either directly, by persuading the court that the employer's action was more likely motivated by a discriminatory reason, or indirectly, by showing that the employer's proffered explanation is unworthy of credence. *See McDonnell Douglas*, 411 U.S. at 804-05.

Throughout this burden-shifting analysis, the ultimate burden of proving intentional discrimination rests with plaintiff. *See Burdine*, 450 U.S. at 253-57. A plaintiff meets this burden if his "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148 (2000).

### A. Prima Facie Case

Cree disputes that Plaintiff has met his initial burden of establishing a prima facie case of discrimination.  There is no dispute that Massetti was at least 40 years of age at the time of his termination and was subject to an adverse employment action.  However, Cree disputes the required element that Massetti was "replaced" by a sufficiently younger person[5], and that

---

[5]  After his termination, Bickley (over 40 but ten years younger than Massetti) assumed a portion of the responsibilities for Cree's relationship with WESCO.  However, Katich was offered the newly created position of Regional Channel Manager  in late October or early November of 2017 and didn't  began servicing the WESCO account until  "sometime in the middle of 2018."

Massetti was qualified for the position he held because he was not performing his job at a level that met his employer's legitimate expectations. These concerns are best left to the later stages of the *McDonnell Douglas* analysis, as Plaintiff's burden of production is "minimal." *Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 938-39 (3d Cir. 1997).   Plaintiff was objectively qualified, to the extent necessary for the narrow analysis here, for the positions of Strategic Account Manager and later, Director of Strategic Distribution, and younger employees undertook Massetti's duties, in some form, after he departed.  Therefore, based on the record before us and after a careful review of the applicable case law, we find that Plaintiff has met his burden of production as to his prima facie case.

### B. Legitimate Nondiscriminatory Reason

Next, we look to whether Cree proffers a legitimate nondiscriminatory reason for the termination of Massetti's employment.    The record evidence supports defendant's articulated, legitimate, non-discriminatory reason for the adverse employment action.  Plaintiff had a documented and significant history of sales performance deficiencies dating back to fiscal year 2013.  There is ample evidence of record to show that these and other factors caused Cree to place Massetti on a PIP, with specifically delineated and communicated goals, and after Massetti was unable to achieve the PIP requirements, he was terminated.  Plaintiff appears to concede that Cree has met its burden in this regard by not having directly addressed this argument in his brief. *See* Br. in Opp'n to Def's M. for Summ. J., ECF No. 47, at 5.

Thus, Cree has met its relatively light burden to provide a legitimate non-discriminatory reason for termination.

### C. Pretext

At this final stage of the burden-shifting analysis, "the burden shifts back once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015). To meet this burden, a plaintiff must identify evidence from which a reasonable jury could either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. The two prongs of the *Fuentes* test are distinct, and the Court analyzes both prongs to determine whether Plaintiff has presented sufficient evidence to withstand summary judgment. "Regardless of the method, the plaintiff's evidence must allow a reasonable jury to find, by a preponderance of the evidence, that age discrimination was a 'but for' cause of the adverse employment action." *Abels v. DISH Network Service, LLC*, 507 F. App'x 178, 183 (3d Cir. 2012).

To establish pretext under the first prong of *Fuentes,* the plaintiff must do more than "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). "If a plaintiff comes forward with evidence that would cause a reasonable factfinder to find the defendant's proffered reason 'unworthy of credence,' [he] need not adduce any evidence of discrimination beyond [his] prima facie case to survive summary judgment."

*Burton,* 707 F.3d at 430 (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr*., 691 F.3d 294, 310 (3d Cir. 2012)). In other words, the plaintiff must prove "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc). Thus, in analyzing this prong, "'federal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound business decision; it is whether the real reason is [discrimination].'" *Id.* (quoting *Carson v. Bethlehem Steel Corp*., 82 F.3d 157, 159 (7th Cir. 1996)).

As to this prong of the *Fuentes* test, Defendant correctly submits that Plaintiff has failed to present evidence from which a factfinder could reasonably disbelieve Cree's articulated reasons for his termination on the basis of their degree of, e.g., implausibility, inconsistency, incoherency or contradiction.

First, as to the performance reviews dating back to 2013, there are consistent comments in the record which show Cree's continual and escalating concerns in specific areas of his job performance, namely sales, stakeholder relationships, and strategic planning. These were communicated to him, and when he was unable to improve, Cree issued a PIP. While he did receive positive feedback during his reviews there is no genuine dispute of material fact that he failed to meet sales goals for WESCO, which ultimately caused Cree to lose market share. Defendant has shown that sales goals were reasonable, given past documented performance for the WESCO account. The goals for the CSP accounts - which we do not second guess - were also set by applying a growth sales percentage, which is not so inconsistent or implausible that it could be pretext for age-based discrimination. And there is no dispute that Massetti failed to meet all three of the conditions of the PIP. Sales declined, and Bickley and Eagle concluded

Massetti had not adequately informed WESCO about the C-Lite stock and flow product line, Massetti was unaware of the extent of the backlog of planned business which had not yet turned into purchase orders, and by extension failed to develop plans necessary to meet the sales goals. And although Cree may have begun to search for a replacement for Plaintiff in the fall of 2017, as Plaintiff suggests, this is not evidence of pretext discriminatory intent given the legitimate and well-documented stated reason for Plaintiff's termination.

Thus, we find that based on the undisputed facts of record, a jury could not reasonably conclude that Plaintiff has established pretext under the "unworthy of credence" prong of *Fuentes*.

Under the second prong of *Fuentes*, a plaintiff may establish pretext "by presenting evidence 'with sufficient probative force' so as to allow the factfinder to 'conclude by a preponderance of the evidence that age was a motivating or determinative factor.'" *Willis,* 808 F.3d at 645 (quoting *Simpson v. Kay Jewelers*, 142 F.3d 639, 644-45 (3d Cir. 1998)). This proof may consist of evidence that: "(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably." *Id.*

We note that the record lacks evidence that any younger, similarly situated Cree employee was treated more favorably by either Bickley or Eagle. Massetti was a strategic account manager for CSPs, whom Cree considered the most important and focused distributing accounts. Starting in May 2017, Bickley became responsible for overseeing Cree's national distributor account executives, including Brian Hollin, who assumed responsibility over CSP Rexel and who was born in 1973 and age 44 at that time. Hollin was in that position for less than a year at the time of Massetti's termination in October of 2017, and therefore could not have

failed to achieve sales goals for several consecutive years like Massetti did.  Hollin never had a PIP[6] and in fact, was achieving Cree's sales objectives at that time.  While Katich was hired on January 2, 2018 after Massetti was terminated, and eventually assumed responsibility for the WESCO account in the middle of 2018, he is not a valid comparator, neither.  His job title was different and he was initially only assigned to non-CSP-designated customers.  In addition, Eagle had left Cree in December 2017 before Katich took over the WESCO relationship, and Bickley did not evaluate him during the brief time they overlapped, prior to Bickley's departure.  In addition, Katich's performance as to quarterly sales metrics exceeded Massetti's.

During a brief conversation in April or May of 2017, Massetti introduced himself to Eagle and recalls Eagle mentioning a plan to pursue a "new and fresh approach" and to look at things differently at Cree.  Massetti testified that he perceived this at the time as a positive comment, and believed a fresh approach was what Cree needed.  He now contends it is evidence Cree acted with discriminatory motive.   Post-hoc speculation or subjective beliefs are insufficient to withstand a motion for summary judgment. *See, e.g., Wharton v. Danbert*, 854 F.3d 234, 244 (3d Cir. 2017); *Ekhato v. Rite Aid Corp.*, 529 F. App'x 152, 156 (plaintiff's "subjective believe that the decision to terminate her employment was discriminatory" was insufficient on summary judgment). Moreover, as Defendant aptly notes, numerous courts have interpreted the term "fresh" as not sufficient to support a finding of pretext, especially when, as here, it was not stated in the context of an assessment of plaintiff.  *See, e.g., Lewis v. Temple Univ. Health Sys.*, C.A. 13-3527, 2015 WL 1379898, at *18 (E.D. Pa. March 26, 2015).   Given the overall uncontroverted record before us, including its timing, plaintiff's substandard performance over a broad period of time, and the imposition of the 60-day PIP directly in

---

[6] In fact, other Cree employees were placed on PIPs.

relation to Massetti's declining performance noted by multiple supervicors since 2015, this remark is not evidence of discriminatory motive.

Accordingly, construing the evidence in the light most favorable to Plaintiff as the nonmoving party, he has not met his burden to show pretext as required by *Fuentes*.  He does not present sufficient evidence from which a reasonable jury could find that Cree's articulated reason for termination of his employment was pretext for age discrimination.  The Court will grant summary judgment as to the claim of age discrimination under both the ADEA and PHRA.

## IV.  Conclusion

For these reasons, the Motion for Summary Judgment will be granted. An appropriate order will be entered contemporaneously herewith.

DATED:  August 14, 2020

/s/*Robert J. Colville*
Robert J. Colville
United States District Judge

CC:  Counsel of record via CM-ECF